UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════════

MICHAEL NOLAN,

                        Plaintiff,

        v.                                              **DECISION AND ORDER**
                                                        21-CV-922S

WESTERN REGIONAL OFF TRACK BETTING
CORPORATION,   RICHARD   D.   BIANCHI,
*individually and in his capacity as chairman of
the WROTB Board of Directors*, and HENRY
WOJTASZEK*, individually and as president of
WROTB*,

                        Defendants.

═══════════════════════════════════

## I.      INTRODUCTION

In this action, Plaintiff Michael Nolan primarily alleges that Defendants Western Regional Off Track Betting Corporation ("WROTB"), Richard D. Bianchi, and Henry Wojtaszek retaliated against him for engaging in whistleblowing activities that were protected by the First Amendment.  Nolan also asserts related state-law claims.

Pending before this Court is Defendants' motion to dismiss Nolan's complaint for failure to state a claim upon which relief can be granted under Rule 12 (b)(6) of the Federal Rules of Civil Procedure.[1]  (Docket No. 12.)  For the reasons set forth below, the motion is granted in part and denied in part.

---

[1] In support of their motion, Defendants filed a notice of motion, a declaration with exhibits, a memorandum of law, a reply memorandum of law, and a supplemental memorandum of law.  (Docket Nos. 12, 17, 30, 34.)   Nolan filed a memorandum of law in opposition, a declaration with exhibit, a supplemental memorandum, and a supplemental affidavit.  (Docket Nos. 16, 33.)  This Court took the motion under advisement without oral argument.

## II.    BACKGROUND

### A.    Facts

This Court assumes the truth of the factual allegations contained in the complaint. See Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 740, 96 S. Ct. 1848, 48 L. Ed. 2d 338 (1976); see also Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll., 128 F.3d 59, 63 (2d Cir. 1997).

WROTB is a public-benefit corporation established, organized, and existing under New York law.  Complaint, Docket No. 1, ¶ 2; N.Y. Rac. Pari-Mut. Wag. & Breed. L. § 502 (1).  WROTB has a Board of Directors with 17 seats.  Complaint, ¶ 12.  The seats are filled by individuals appointed to represent the cities of Buffalo and Rochester, as well as the following 15 New York counties: Cattaraugus; Cayuga; Chautauqua; Erie; Genesee; Livingston; Monroe; Niagara; Orleans; Oswego; Schuyler; Seneca; Steuben; Wayne; and Wyoming.  Id.  Defendant Bianchi was at all times relevant the Chairman of the Board of Directors.  Id. ¶ 3.  Defendant Wojtaszek was at all times relevant WROTB's President and Chief Executive Officer.  Id. ¶ 4.

Nolan began working at WROTB on May 26, 2011.  Id. ¶ 10.  WROTB promoted him to Executive Vice President of Administration and Operations later that year, and then further promoted him to Chief Operating Officer in June 2017.  Id.

As Chief Operating Officer, Nolan took instructions from and reported to Defendant Wojtaszek.  Id. ¶ 11.  Nolan's duties included supervising WROTB's day-to-day operations, supervising operational department directors, participating in Board meetings, and other management functions.  Id.  Nolan also served as WROTB's freedom of information law ("FOIL") officer, which required him to respond to inquiries seeking access

2

to WROTB's records and other information.  Id. ¶¶ 13, 14.  Nolan also acted as director of ordering and purchasing.  Id. ¶ 13.

During Nolan's tenure at WROTB, several governmental agencies investigated WROTB's operations and the actions taken by certain members of its Board.  Id. ¶ 17. These included investigations by the FBI, the United States Attorney's Office for the Western District of New York, the New York State Comptroller's Office, the New York State Gaming Commission, and various district attorneys' offices.  Id.

Nolan alleges upon information and belief that these investigations concerned (1) WROTB providing rich health insurance benefits to WROTB Board members, (2) WROTB awarding lucrative contracts to politically-connected entities associated with WROTB, (3) the appointment of a politically-connected individual as a Board member solely to provide that individual with health insurance benefits, (4) the improper use of video lottery terminal ("VLT") purse funds, and (5) the distribution and personal use of luxury box and event tickets purchased by WROTB to friends, family, and political associates.  Id. ¶ 18.

Nolan further alleges upon information and belief that the Monroe County district attorney's office investigated whether Defendant Wojtaszek was involved in bid-rigging in Niagara County.  Id. ¶ 21.  And he also alleges that former New York senator George Maziarz publicly accused WROTB and Defendant Wojtaszek of wrongdoing in February 2019.  Id. ¶ 20.

In addition to these governmental investigations, the media also inquired about WROTB's practices, including questioning trips taken by Defendant Wojtaszek and another WROTB officer to an industry conference in Phoenix, Arizona.  Id. ¶ 19.  The media questioned whether Defendant Wojtaszek and the other WROTB officer actually

attended the conference or whether they instead drove to Las Vegas for purely recreational purposes at WROTB's expense.  Id.

At the time of these various investigations, Nolan had significant concerns about the same issues being investigated.  Id. ¶ 22.  He expressed his concerns to the WROTB Board and to Defendants Wojtaszek and Bianchi, both orally and in writing, in February or March 2019.  Id. ¶ 23.  Specifically, Nolan spoke in Executive Session to several WROTB Board members, including Defendants Wojtaszek and Bianchi, about the awarding of contracts to certain entities, the negative press about WROTB, and WROTB providing health insurance to Board members.  Id. ¶ 24.  Nolan also detailed his concerns in an email to a WROTB representative and to Board member Philip Barnes.  Id. ¶ 25.

Following these discussions and disclosures, the WROTB Board directed Nolan and another WROTB Board member to retain outside counsel to determine the legality of the health insurance being provided to part-time WROTB Board members.  Id. ¶ 26. Nolan retained an area law firm, as directed, which ultimately concluded that the health insurance being provided to WROTB Board members was improper and should be discontinued.  Id. ¶¶ 27, 28.  Nonetheless, Defendants did not and have not stopped providing health insurance to WROTB Board members.  Id. ¶ 29.

At this same time—February and March of 2019—Nolan and another WROTB Board member discussed the other WROTB improprieties with different legal counsel than the one retained specifically to address the provision of health insurance.  Id. ¶ 30. Nolan maintains that this consultation occurred in the performance of his official duty and was necessary to satisfy his fiduciary obligation as a ranking executive of WROTB.  Id. The matters discussed included (1) WROTB awarding contracts to politically-connected

entities, (2) the appointment of WROTB Board members for the sole purpose of providing them health insurance, (3) improper use of VLT purse funds, and (4) distribution of luxury box and event tickets to WROTB friends and family members.  Id. ¶ 31.  Counsel advised Nolan of the "illegality of these actions," which Nolan reported to the WROTB Board of Directors, specifically to Defendants Wojtaszek and Bianchi.  Id. ¶ 32.

Nolan's report of counsel's findings was not well received.  Defendants Wojtaszek and Bianchi were threatened by Nolan's concerns, and they displayed aggressive and ostracizing behavior towards him.  Id. ¶ 33.  Defendants were unwilling to listen to, act on, or address the irregularities, bad practices, and possible illegalities that Nolan and the other Board member brought to their attention.  Id. ¶ 34.

After Nolan expressed his concerns to Defendants, governmental authorities, including the FBI and United States Attorney's Office for the Western District of New York, contacted and questioned Nolan and various other officers, directors, and employees of WROTB.  Id. ¶¶ 36, 37, 39.  Some or all of the interviewees told investigators that Nolan was an honest person who had detailed knowledge of the workings of WROTB and may have insights into the matters the agencies were investigating.  Id. ¶¶ 37, 38.

As a result of those interviews, the FBI contacted Nolan directly.  Id. ¶ 39.  Nolan also received a subpoena to appear before a grand jury on October 3, 2019, to testify about his knowledge of the matters under investigation.  Id. ¶ 40.  Faced with what he describes as "conflicting mandates" and "conflicting circumstances," see id. ¶ 58, Nolan retained an attorney to advise him on how to carry out his duties while still providing truthful answers to the investigators' questions.[2]  Id. ¶¶ 41, 58.

---

[2]  In the allegations supporting his fourth cause of action, Nolan further describes his reasons for retaining counsel as follows:

During the investigations and interviews that ensued, Nolan maintained that certain practices at WROTB were irregular, unethical, ill-advised, and contrary to official policies, legal opinions, and mandates.  Id. ¶ 45.  For example, Nolan was concerned about the improper use of WROTB vehicles and cell phones, a concern that was only heightened when the media submitted FOIL requests for data concerning vehicle and cell phone usage.  Id. ¶ 47.  Nolan did not, however, form or convey any opinions as to whether any of WROTB's practices violated any criminal statutes.  Id. ¶ 46.

Nolan cooperated with the FBI, the United States Attorney's Office for the Western District of New York, and other investigating agencies, and he answered their questions directly and honestly.  Id. ¶ 48.  He did not request or receive immunity, and he provided only truthful answers in an effort to correct flawed policies and improper practices for the good of WROTB.  Id. ¶ 44.

Nolan disclosed his communications with the investigative agencies to Defendants, both directly and through WROTB's counsel.  Id. ¶¶ 49, 50.  He relayed to Defendants that he answered each of the investigating agencies' questions honestly and candidly.  Id. ¶¶ 49, 50.  Upon learning that Nolan had provided truthful information about WROTB to investigators, Defendants Wojtaszek and Bianchi were "horror-stricken" and reacted with "intense anger, hostility, hatred, and vitriol" against Nolan.  Id. ¶¶ 51, 52.

---

"Plaintiff's retention of legal counsel was . . . to get guidance on how to respond to inquiries by investigative agencies, how to deal with fraudulent FOIL responses being given to the media and others by Defendants while Plaintiff was in the role of Chief Operation Officer, and how to reconcile his responsibilities to the WROTB Board of Directors with his duty of obedience to his direct supervisor, Defendant Wojtaszek, and Defendant Chairman Bianchi, and how to navigate the hostile employment environment."

Complaint, ¶ 92.

And this was before they were told the substance of Nolan's conversations with investigators.  Id. ¶¶ 51, 52.

After Nolan met with the FBI and other investigators, Defendants engaged outside counsel at Defendant Wojtaszek's insistence.  Id. ¶ 53.  Nolan was instructed to disclose to outside counsel everything that he had discussed with the FBI and other investigators.  Id. ¶ 54.  Outside counsel interviewed Nolan and Nolan's attorneys and then prepared a 300-page report that included summaries of the interviews.  Id. ¶¶ 55, 56.  Access to the report was restricted to read-only, such that Board members each had only one hour to review it and no copies could be retained.  Id. ¶ 56.  Nolan alleges that the report was narrowly confined to the interviews conducted with him and his counsel and the subject matter that Nolan discussed with the FBI and other collaborating agencies.  Id. ¶ 57.  After the report was disclosed, Defendants Bianchi and Wojtaszek informed Nolan that WROTB would not pay his personal attorney's legal fees, which at that time amounted to more than $80,000.  Id. ¶¶ 41, 58.

Nolan alleges that Defendants, acting through Defendants Bianchi and Wojtaszek, directly retaliated against him for voicing his concerns over Defendants' actions and disclosing that he was truthful when questioned by investigators.  Id. ¶ 59.  Nolan describes the retaliation as swift, aggressive, and austere, and alleges that it consisted of ongoing and continuous harassment, isolation, ostracism, belittling, adverse employment actions, and intimidation, as specifically set forth in the complaint.  Id. ¶¶ 59-63.

Such conduct included (1) excluding Nolan from contact with Defendants Wojtaszek and Bianchi, (2) threatening Nolan with termination, (3) subordinating Nolan

to other WROTB employees he managed, (4) providing false performance ratings and evaluations, and (5) wrongfully threatening and terminating Nolan's employment.  Id.  It also included excluding Nolan from Board Meetings and Executive Sessions, removing him as the FOIL officer, refusing to communicate with him as it concerned the day-to-day management of WROTB, and excluding him from social and community service events. Id. ¶¶ 59, 60.

Nolan further alleges that he suffered the following adverse employment actions: (1) he was removed as purchasing officer, records officer, and FOIL officer; (2) he was required to work weekends; (3) he was not given a raise in salary in 2020, and was given a poor employee evaluation score for 2019, despite having received a raise and an above average employee evaluation score for each of the prior eight years; (4) he had his salary halved during COVID-19, while the salaries of other employees were not reduced; and (5) he was wrongfully terminated.  Id. ¶¶ 15, 63.

Nolan maintains that Defendants had no "whistleblower" policies or procedures in place to protect employees who reported irregularities.  Id. ¶ 35.  He further maintains that he was wrongfully terminated on December 18, 2020, for cooperating with investigators and speaking out about WROTB's improprieties.  Id. ¶¶ 16, 59-63.

**B.     Procedural History**

Nolan filed his complaint on August 12, 2021.  (Docket No. 1.)  Defendants moved to dismiss on November 12, 2021.  (Docket No. 12.)  After full briefing, this Court granted Defendants' motion to dismiss Nolan's federal claim on statute of limitations grounds and declined to exercise jurisdiction over Nolan's state-law claims.  See Nolan v. W. Reg'l Off Track Betting Corp., 21-CV-922S, 2022 WL 7085517 (W.D.N.Y. Oct. 12, 2022).  Nolan

appealed, and on September 25, 2023, the United States Court of Appeals for the Second Circuit reversed this Court's determination and remanded the case for full consideration of Defendants' motion to dismiss.  See Nolan v. W. Reg'l Off Track Betting Corp., 22-2786-cv, 2023 WL 6205964 (2d Cir. Sept. 25, 2023) (summary order).

After the Second Circuit lodged its Mandate (Docket No. 28), this Court directed that Defendants' motion to dismiss be reinstated and that the parties file supplemental briefing.  (Docket No. 29.)  Supplemental briefing concluded on December 22, 2023, see n.1 *supra*, after which this Court took the motion under advisement without oral argument.

## III.    DISCUSSION

Plaintiff asserts five causes of action.  First, he alleges under 42 U.S.C. §§ 1983 and 1988 that Defendants retaliated against him for cooperating with investigators and speaking out about improprieties at WROTB, in violation of his First Amendment rights.  Complaint, ¶¶ 65-73.  Second, he alleges that Defendant WROTB subjected him to retaliatory adverse employment actions, in violation of New York Civil Service Law § 75-b (2)(a).  Id. ¶¶ 74-80.  Third, Nolan asserts an intentional-infliction-of-emotional-distress claim against Defendants Bianchi and Wojtaszek.   Id. ¶¶ 81-87.  Fourth, he seeks indemnification and reimbursement of attorneys' fees against Defendant WROTB under New York Public Officers Law §§ 18, 19, et seq.  Id. ¶¶ 88-94.  Finally, Nolan alleges that WROTB retaliated against him in violation of New York Labor Law §§ 740 (2)(a) and(b).  Id. ¶¶ 95-99.

Defendants move to dismiss each of Nolan's claims for failure to state a claim upon which relief can be granted.  See Fed. R. Civ. P. 12 (b)(6).  Nolan largely opposes the motion.

A.      **Rule 12 (b)(6) Standard**

Rule 12 (b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12 (b)(6).  In addition, if it appears from the face of the complaint that a cause of action has not been brought within the applicable statute of limitations period, the defense of limitations "may be raised in a pre-answer motion pursuant to Fed. R. Civ. P. 12 (b)(6)."  Santos v. Dist. Council of N.Y.C., 619 F.2d 963, 967 n.4 (2d Cir. 1980); see also Ghartley v. St. John's Queens Hosp., 869 F.2d 160, 162 (2d Cir. 1989).

Federal pleading standards are generally not stringent: Rule 8 requires only a short and plain statement of a claim.  Fed. R. Civ. P. 8 (a)(2).  But the plain statement must "possess enough heft to show that the pleader is entitled to relief."  Bell Atl. Corp. v. Twombly, 550 U.S. 554, 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation."  Ashcroft v. Iqbal, 556 U.S. 662, 678-79, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting Twombly, 550 U.S. at 555). "Labels and conclusions" or "a formulaic recitation of the elements of a cause of action" also will not do.  Twombly, 550 U.S. at 555; Iqbal, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570); id. at 679 ("[O]nly a complaint that states a

plausible claim for relief survives a motion to dismiss.").  Facial plausibility exists when the facts alleged allow for a reasonable inference that the defendant is liable for the misconduct charged.  Iqbal, 556 U.S. at 678.  Plausibility requires finding "more than a sheer possibility that a defendant has acted unlawfully," id., but it is not a probability requirement, Twombly, 550 U.S. at 570.  The well-pleaded allegations in the complaint need only nudge the claim "across the line from conceivable to plausible."  Id.

When determining whether a complaint states a claim, the court must construe it liberally, accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).   Legal conclusions, however, are not afforded the same presumption of truthfulness.  See Iqbal, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions").  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  Id. at 662; id. at 686 ("[T]he Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context.").

A two-pronged approach is thus used to examine the sufficiency of a complaint. This examination is context specific and requires the court to draw on its judicial experience and common sense.  See Iqbal, 556 U.S. at 679.  First, statements that are not entitled to the presumption of truth, such as conclusory allegations, labels, and factually unsupported legal conclusions, are identified and stripped away.   See id. Second, well-pleaded, non-conclusory factual allegations are presumed true and examined to determine whether they "plausibly give rise to an entitlement to relief."  Id.

"Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint fails to state a claim.  Id.

In considering a motion to dismiss under Rule 12 (b)(6), "a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated into the complaint by reference, and to matters of which judicial notice may be taken."  Leonard F. v. Isr. Disc. Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); see also Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004).  "[W]here a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect," thereby rendering the document "integral to the complaint."  Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 152–53 (2d Cir. 2002)).  But even where a document is "integral" to the complaint, it cannot serve as the basis for dismissal unless there is no dispute as to its authenticity, accuracy, and relevance.  See Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006) (internal citations omitted).

The only document Nolan appends to the complaint is his Notice of Claim, dated September 21, 2020.  (Docket No. 1-1.)  That Notice of Claim is properly considered, along with the facts in Nolan's complaint.  See Leonard F., 199 F.3d at 107.

But the parties have also submitted extraneous documents with their motion papers, under the auspices that they are incorporated by reference or integral to the complaint.  For extraneous documents to be considered incorporated into a complaint by reference, the complaint must make "a clear, definite and substantial reference to the documents."  Helprin v. Harcourt, Inc., 277 F. Supp. 2d 327, 330-31 (S.D.N.Y. 2003).

Mere mention or limited quotation of a document "does not constitute incorporation by reference." Goldman v. Belden, 754 F.2d 1059, 1066 (2d Cir. 1985).  And for extraneous documents to be considered integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint.  See Cortec, 949 F.2d at 48.

Defendants have submitted numerous extraneous documents.  The lot consists of Nolan's 2019 Confidential Employee Performance Evaluation, his Performance Improvement Plan, a tolling agreement, a letter between counsel terminating the tolling agreement, minutes from a Board of Directors meeting, Nolan's letter of termination, Nolan's February 24, 2021 Notice of Claim, and the prebill Nolan submitted for reimbursement of his legal fees.  See Declaration of Matthew K. Parker, Esq., Docket No. 12-1.

While three of these documents are mentioned in the complaint—the performance evaluation, the performance improvement plan, and the prebill— the complaint does not make substantial reference to them nor does it appear that Nolan relied on them in drafting the complaint.  They are simply mentioned.  Other documents, such as the tolling agreement, letter between counsel, minutes, and the February 2021 Notice of Claim are not even mentioned in the complaint.  This Court therefore finds that none of these extraneous documents are incorporated into or integral to the complaint.[3]  They will thus not be considered at this stage, nor will arguments reliant on those documents.  The same

---

[3] Defendants further urge this Court to take judicial notice of the February 2021 Notice of Claim, but since it is not referenced in the complaint and Nolan objects to its consideration, this Court declines to do so. See Jarzembek v. Cnty. of Erie, Case No. 1:20-cv-1796, 2021 WL 4711485, at *1 (W.D.N.Y. Oct. 8, 2021) (noting that "[c]ourts in the Second Circuit may take judicial notice of a notice of claim where a complaint directly references the plaintiff's notice of claim.").

holds true for Nolan's submission of his grand jury subpoena, which is similarly extraneous.  <u>See</u> Declaration of Jeffrey B. Novak, Esq., Docket No. 16-1.  Nolan's affidavit, <u>see</u> Docket No. 33-1, is also improper at this stage and is not considered.  <u>See</u> <u>Novie v. Vil. of Montebello</u>, No. 10-CV-9436 (CS), 2012 WL 3542222, at *9 (S.D.N.Y. Aug. 16, 2012) (finding that "it is improper for a court to consider declarations and affidavits on a motion to dismiss").

## B.    Nolan's Causes of Action

### 1. First Amendment Retaliation Claim

At the outset, Nolan concedes that his First Amendment retaliation claims against Defendants Bianchi and Wojtaszek in their official capacities should be dismissed as duplicative of his claims against WROTB.  <u>See</u> Memorandum of Law, Docket No. 16, p. 16.  Indeed, official-capacity claims against individual defendants are redundant where the same claim is lodged against the entity.  <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); <u>Anemone v. Metro. Transp. Auth.</u>, 410 F. Supp. 2d 255, 264 n. 2 (S.D.N.Y. 2006) ("Where, as here, the entity also is named as a defendant, the official capacity claims are redundant and are properly dismissed.").  Nolan's First Amendment claims against Defendants Bianchi and Wojtaszek in their official capacities are therefore dismissed by agreement.

"To survive a motion to dismiss, a plaintiff claiming that he was retaliated against in violation of the First Amendment must plausibly allege that (1) he engaged in speech or activity that was protected by the First Amendment; (2) he suffered an adverse

employment action; and (3) a causal connection existed between the adverse action and the protected activity." Specht v. City of New York, 15 F. 4th 594, 599-600 (2d Cir. 2021) (citing Smith v. Cnty. of Suffolk, 776 F.3d 114, 118 (2d Cir. 2015)); Gonzalez v. Hasty, 802 F.3d 212, 222 (2d Cir. 2015).

A public employee's speech is protected by the First Amendment "when the employee speaks as a citizen on a matter of public concern, rather than pursuant to his employment responsibilities." Specht, 15 F.4th at 600 (citing Garcetti v. Ceballos, 547 U.S. 410, 420-21, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)); Ross v. Breslin, 693 F.3d 300, 305 (2d Cir. 2012. This is because "a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." Connick v. Myers, 461 U.S. 138, 140, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). Consequently, "[f]or a public employee to state a First Amendment retaliation claim, the employee must allege that (1) he or she spoke as a citizen on a matter of public concern, (2) he or she suffered an adverse employment action, and (3) a causal connection exists between the protected speech and adverse employment action." Foy v. NYS Unified Ct. Sys., No. 23-cv-656 (KAM)(SJB), 2024 WL 3270711, at *8 (E.D.N.Y. July 2, 2024) (quotation marks and citations omitted).

As to the first element, a plaintiff must plausibly plead both that he spoke as a citizen, rather than as a consequence of his job requirements, see Garcetti, 547 U.S. at 418, and that his speech touched a matter of public concern, see Sprecht, 15 F.4th at 602. "Speech deals with matters of public concern when it can be fairly considered as relating to matters of political, social, or general interest to the community or value and concern to the public." Specht, 15 F.4th at 600 (citing Snyder v. Phelps, 562 U.S. 443,

453, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011)).  To identify matters of public concern, courts "consider the motive of the speaker, cognizant that speech on a purely private matter does not pertain to a matter of public concern and, conversely, that an individual motivated by personal grievance can simultaneously speak on a matter affecting the public at large[.]"  Golodner v. Berliner, 770 F.3d 196, 203 (2d Cir. 2014).  Notably, "possible governmental misconduct is a legitimate and an important topic of public concern."  Specht, 15 F. 4th at 601 (collecting cases).

The second element requires the suffering of an adverse employment action.  For purposes of the First Amendment, an adverse employment action is one that would "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."  Wrobel v. Cnty. of Erie, 692 F.3d 22, 31 (2d Cir. 2012).  This test is highly context-specific and must be tailored to the different circumstances in which retaliation claims arise.  See Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 273 (2d Cir. 2011).  Examples of adverse actions include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."  Morris v. Lindau, 196 F. 3d 102, 110 (2d Cir. 1999).

The final element—causal connection—requires plausible allegations that the protected speech was a substantial motivating factor in the adverse employment action.  See Smith v. Cnty. of Suffolk, 776 F.3d 114, 118 (2d Cir. 2015); Morris, 196 F. 3d at 110.  Causation may be demonstrated, among other ways, by showing that the protected speech and the adverse employment action occurred close in time.  See Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 168 (2d Cir. 2006).  The Second Circuit has found that up to a 6-month passage of time is sufficient to permit an inference of

causation.  See Specht, 15 F.4th at 605 (citing Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009).

Defendants argue that Nolan's First Amendment claim must be dismissed because he fails to sufficiently plead that he was speaking as a private citizen.  Misconstruing an allegation in the complaint, Defendants maintain that Nolan admits that he was acting within the scope of his employment, and not as a private citizen, "when he discussed the alleged WROTB improprieties with investigators and outside counsel . . . ."  See Supplemental Memorandum of Law, Docket No. 30, p. 17; see also Memorandum of Law, Docket No. 12-11, p. 23 (both citing Complaint, ¶ 30).  But that is not what the complaint says.  Paragraph 30 of the complaint alleges that Nolan discussed WROTB improprieties "*with additional outside counsel*" in the performance of his duties consistent with his position as an executive and Board member of WROTB.  Complaint, ¶ 30 (emphasis added).  It says nothing of his interactions with investigators, which is the contact upon which his claim is based.  There is therefore no admission, as Defendants argue.[4]

As to Nolan's interactions with government investigators, Nolan alleges that he "was speaking as a private citizen on matters of public concern" when he provided information "to the respective law enforcement agencies investigating Defendant WROTB."  Complaint, ¶¶ 67, 69.  Indeed, Nolan alleges that he personally cooperated with law enforcement investigators (and retained personal counsel) only after Defendants

---

[4] Defendants also maintain that Nolan's allegation that "[a]t all times alleged herein, [he] was acting within the scope of his public employment and duty on behalf of WROTB," see Complaint, ¶ 89, is a fatal admission that he was not speaking as a private citizen.  But this allegation is not incorporated into Nolan's First Amendment claim.  It is instead made in support of his claim for reimbursement or indemnification of certain legal fees under the New York Public Officers Law, which claim will be dismissed for the reasons stated herein.  See id. ¶¶ 88-94.  It is also plausible that a portion, but not all, of Nolan's speech was made as a private citizen.  This Court therefore declines to construe the allegation in paragraph 89 of the complaint as an admission fatal to Nolan's First Amendment claim at this stage.

were unwilling to listen to, act on, or address his concerns when he presented them in the course of his official duties.  Id. ¶¶ 33-35, 41, 44.  He further alleges that he cooperated with investigators at his own election in furtherance of the best interests of taxpayers and the public by calling attention to WROTB's irregularities.  Id. ¶ 35.  This is sufficient to plead the first element of the claim.

Defendants next argue that Nolan cannot plead a causal connection between his speech and a timely adverse employment action.  But this argument is fundamentally flawed because Defendants rely on the statute of limitations applicable to Nolan's state-law claims, not the statute of limitations applicable to his federal claim.  As the Second Circuit determined, Nolan's First Amendment claim is subject to the 3-year statute of limitations that applies to § 1983 claims.  See Nolan, 2023 WL 6205964, at *1.  Since Nolan filed his complaint on August 12, 2021, his interactions with governmental investigators and the alleged retaliation resulting therefrom in 2019 and later are firmly within the statute of limitations period.  See Complaint, ¶¶ 23, 24, 36; Nolan, 2023 WL 6205964, at *1 ("Applying the correct three-year statute of limitations, Nolan's August 2021 complaint was timely because he alleges retaliatory conduct beginning in 2019.").  This basis for dismissal is therefore rejected.

Defendants further argue that Nolan fails to plead a causal connection because too much time passed between his protected speech and the adverse actions he suffered.  In making this argument, Defendants construe the facts and inferences in their own favor, rather than Nolan's, and they rely on documents not properly considered at this stage, such as the performance evaluation, performance improvement plan, and Board minutes.

Moreover, they principally rely on cases decided at the summary judgment stage, not the pleading stage.

Properly reading the complaint liberally and drawing all inferences in Nolan's favor, the complaint sufficiently alleges retaliatory acts occurring in proximity to Nolan's protected speech.  Nolan alleges that Defendants began retaliating against him at least as early as April 2019, and that the retaliation remained ongoing and continued after his various disclosures.  See Complaint, ¶¶ 59, 60.  Because Nolan alleges multiple acts of retaliation (not just a poor performance review or salary reduction, for example), and because he alleges that those acts of retaliation were ongoing and continuous, it cannot be determined at this stage whether temporal proximity may reasonably allow for an inference of causation.  Discovery will flesh out the relevant dates and acts, after which a determination can be made on a full record.  Dismissal for failure to plead a causal connection is therefore denied.

Defendants' remaining arguments center around the sufficiency of Nolan's allegations under § 1983.  Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws.  To properly plead a cause of action under § 1983, a plaintiff's complaint must include allegations that the challenged conduct "(1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."  Whalen v. Cnty. of Fulton, 126 F.3d 400, 405 (2d Cir. 1997); Hubbard v. J.C. Penney Dep't Store, 05-CV-6042, 2005 WL 1490304, at *1 (W.D.N.Y. June 14, 2005).

Public-benefit corporations, such as WROTB, are treated as municipalities for the purposes of determining liability under § 1983.  See Dangler v. N.Y.C. Off Track Betting Corp., 193 F.3d 130, 133, 137 (2d Cir. 1999); Starks v. Metro. Transp. Auth., 1:20-cv-9569 (MKV), 2022 WL 814668, at *6 (S.D.N.Y. Mar. 17, 2022).  Municipal liability is imposed under § 1983 only when the municipality's official custom or policy causes an employee to violate an individual's constitutional rights.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  Such liability cannot be premised solely on a *respondeat superior* theory, but must be based on constitutional deprivations caused by an officially promulgated, or *de facto*, municipal "custom" or "policy[.]" Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).  Thus, a municipality will be liable for a § 1983 violation only where the municipality itself was the "moving force" behind the deprivation of a plaintiff's federal rights.  See Bd. of the Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown, 520 U.S. 397, 400, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).  That is, a municipality cannot be held liable simply because it employs a tortfeasor.  See Bisignano v. Harrison Cent. Sch. Dist., 113 F. Supp. 2d 591, 601 (S.D.N.Y. 2000).

Consequently, to adequately state a claim against a municipality, a plaintiff must plead the existence of an official policy or custom that caused the denial of a constitutional right.  See Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995).  The existence of a policy or custom can be demonstrated in several ways, including: (1) showing an officially promulgated and endorsed policy, Monell, 436 U.S. at 658; (2) showing that actions taken by officials with final policymaking authority caused a constitutional violation, Pembaur, 475 U.S. at 480–81; (3) showing that the entity's decision-making

evidences "deliberate indifference" to the rights of those with whom employees come in contact, including failure to remedy an otherwise constitutional policy so deficient and widespread that policymakers knew or should have known with a high degree of certainty that constitutional violations could result, City of Okla. City v. Tuttle, 471 U.S. 808, 819, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985), or (4) failure to train employees when training is necessary to prevent the violation of federal rights, City of Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).  To succeed on a Monell claim, a plaintiff must ultimately show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  Outlaw v. City of Hartford, 884 F.3d 351, 373 (2d Cir. 2018) (quoting City of Canton, 489 U.S. at 385).

In assessing a motion to dismiss a Monell claim, "[i]t is well settled that a plaintiff's conclusory allegations, which merely recite the elements of a Monell claim, are insufficient to state a claim for municipal liability." Bryant v. Ciminelli, 6:16-CV-06766 EAW, 2017 WL 3188988, at *3 (W.D.N.Y. July 26, 2017) (citing cases); Weaver v. City of New York, No. 13-cv-20 (CBA)(SMG), 2014 WL 950041, at *7 (E.D.N.Y. Mar. 11, 2014) ("[V]ague and conclusory assertions are not sufficient to state a claim of municipal liability under Monell.")  A plaintiff must allege facts tending to support, at least circumstantially, an inference that the alleged policy or custom exists.  Dwares, 985 F.2d at 100.

Defendants argue that Nolan fails to identify an official policy or custom that caused the denial of his constitutional rights.  See Zahra, 48 F.3d at 685.  They view as impermissibly conclusory Nolan's allegation that "Defendants' retaliatory conduct . . . [was] taken in response to Defendant WROTB's custom and policy of deterring speech by an employee disclosing Defendants' wrongdoing, and to punish the cooperating and/or

"whistle-blowing" employee with adverse employment actions, up to and including Plaintiff's termination."   Complaint, ¶ 71.  And while the absence of any facts supporting this allegation could well make it conclusory, Nolan also alleges that Defendants Bianchi and Wojtaszek, the two individuals whom he accuses of retaliating against him, are high-level policymakers at WROTB—the Chairman of the Board and the President and Chief Executive Officer, respectively.  Complaint, ¶¶ 3, 4, 11, 60, 66.  A municipality's custom or policy may be established by showing that actions taken by officials with final policymaking authority caused a constitutional violation.  <u>Pembaur</u>, 475 U.S. at 480–81. That is what Nolan alleges here.  <u>See</u> Complaint, ¶¶ 11 (describing Defendant Wojtaszek as a "policymaker"); 59 (alleging retaliation by Defendants Bianchi and Wojtaszek), 60 (alleging that Defendants Bianchi and Wojtaszek "influence policy"), 61-63 (alleging retaliation by Defendants Bianchi and Wojtaszek), 66 (alleging that Defendant Wojtaszek and the Board of Directors formulated and set policy).   Consequently, construing the complaint liberally as required, this Court finds that Nolan's <u>Monell</u> claim is sufficiently pleaded.  <u>See</u> <u>Pembaur</u>, 475 U.S. at 481 ("If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood.").

Defendants also seek dismissal of Nolan's § 1983 claim against Defendants Bianchi and Wojtaszek in their individual capacities on the basis that they were not personally involved in the alleged deprivation of Nolan's First Amendment rights. Personal involvement in the deprivation of a federal constitutional right is the *sine qua non* of liability under § 1983.  <u>See</u> <u>Haygood v. City of New York</u>, 64 F. Supp. 2d 275, 280 (S.D.N.Y. 1999).  It is well settled in this circuit that personal involvement by defendants

in cases alleging constitutional deprivations is a prerequisite to an award of damages under § 1983.  See McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977); Richardson v. Coughlin, 101 F. Supp. 2d 127, 129 (W.D.N.Y. 2000); Pritchett v. Artuz, No. 99 Civ. 3957 (SAS), 2000 WL 4157, at *5 (S.D.N.Y. Jan. 3, 2000).

The Second Circuit construes personal involvement in this context to mean "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates."  Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994).  Personal involvement need not be active participation.  It can be found "when an official has actual or constructive notice of unconstitutional practices and demonstrates gross negligence or deliberate indifference by failing to act."  See Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989).

Defendants argue that Nolan fails to state a claim against Defendants Bianchi and Wojtaszek in their individual capacities because they either did not cast a vote to terminate Nolan's employment (Wojtaszek) or did not act alone in voting for his termination (Bianchi).  As to the other acts of alleged retaliation, Defendants argue in conclusory fashion that they do not rise to the level of a constitutional violation.  This Court disagrees.

The alleged adverse employment actions are not limited to Nolan's termination. Nolan alleges that upon learning of his truthful cooperation with law enforcement investigators, Defendants Bianchi and Wojtaszek "reacted with what appeared to [Nolan] to be intense anger, hostility, hatred, and vitriol towards [Nolan]."  Complaint, ¶ 52.  They required Nolan to disclose to WROTB's outside counsel everything that he told the

investigators.  Id. ¶¶ 53-55.  Once Defendants Bianchi and Wojtaszek learned everything Nolan told investigators, they began retaliating against him.  Id. ¶ 59.

Defendants Bianchi and Wojtaszek each excluded Nolan from operational decisionmaking, removed many of his responsibilities, shunned him, subordinated him, reduced his salary by 50%, gave him false performance ratings and evaluations, threatened him with termination, pressured him to resign, and then wrongfully terminated his employment.  Id. ¶¶ 59-63.  These detailed allegations are sufficient to plead personal involvement for purposes of § 1983.  Moreover, in the absence of any specific arguments to the contrary, this Court finds at this stage that these actions, viewed singly or in combination, could well "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights."  Wrobel, 692 F.3d at 31.  Dismissal on this basis is therefore unwarranted.

Finally, Defendants Bianchi and Wojtaszek seek dismissal of Nolan's First Amendment claim on the basis that they are entitled to qualified immunity.  "Qualified immunity protects public officials from civil liability 'if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'"  Coggins v. Buonora, 776 F.3d 108, 114 (2d Cir. 2015) (quoting Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996)); White v. Pauly, 580 U.S. 73, 78-79 137 S. Ct. 548, 196 L Ed. 2d 463 (2017) (per curiam) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").  Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular

case at hand." <u>Pearson v. Callahan</u>, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" <u>Mullenix v. Luna</u>, 577 U.S. 7, 11-12, 136 S. Ct. 305, 193 L. Ed. 2d 255 (2015) (per curiam) (quoting <u>Reichle v. Howards</u>, 566 U.S. 658, 132 S. Ct. 2088, 2093, 182 L. Ed. 2d 985 (2012)).   Clearly established law should not be defined "at a high level of generality."  <u>White</u>, 580 U.S. at 79.  Although the caselaw "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate."  <u>Id.</u> (alteration omitted) (internal quotation marks omitted).

Defendants Bianchi and Wojtaszek argue that they are entitled to qualified immunity because their individual alleged conduct did not violate any clearly established constitutional right.  But a public employee's right to be free from retaliation for speaking as a citizen on matters of public concern was established long before the date of the conduct alleged here.  <u>See, e.g.</u>, <u>Connick</u>, 461 U.S. at 140; <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968).  Accepting the allegations in the complaint as true, this Court finds that Defendants Bianchi and Wojtaszek are not entitled to qualified immunity at this stage.  Their motion to dismiss on that basis will therefore be denied.

### 2.  State-Law Claims

Defendants argue that Nolan's state-law claims are untimely and inadequately pleaded.  Nolan contends that his claims are timely and sufficiently pleaded to survive Defendants' bid for dismissal.  The issues are discussed in turn.

### a. Timeliness

"Because statute of limitations is an affirmative defense, defendants 'moving to dismiss a cause of action as time-barred bear[ ] the initial burden of establishing that the time to sue has expired.'" TADCO Const. Corp. v. Dormitory Auth. of State of N.Y., 700 F. Supp. 2d 253, 273 (E.D.N.Y. 2010) (quoting Town of Hempstead v. Lizza Indus., Inc., 741 N.Y.S.2d 431, 432 (N.Y. App. Div. 2002)).  Dismissal on statute of limitations grounds may only be granted when it is clear from the complaint that the claim is untimely.  See Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999) ("[I]n the statute of limitations context . . . dismissal is appropriate only if a complaint clearly shows the claim is out of time."); Omollo v. Citibank, N.A., No. 07 Civ. 9259 (SAS), 2008 WL 1966721, at *3 (S.D.N.Y. May 6, 2008) (same).

Claims against regional off track betting corporations are governed by the New York Racing, Pari-Mutuel Wagering and Breeding Law.  Under § 514 (5) of that law, no action, other than for wrongful death, may "be commenced more than one year and ninety days after the cause of action thereof shall have accrued, nor unless a notice of claim as required in subdivisions one and two of this section and served as set forth in subdivision three of this section shall have been served upon the corporation within ninety days after such cause of action shall have accrued."

Nolan filed his complaint on August 12, 2021.  Ordinarily then, Nolan's complaint would be timely for any claims accruing on or after May 14, 2020 (1 year and 90 days before August 12, 2021).  But two tolling periods apply: from March 20 to November 3, 2020, by operation of law due to COVID-19-related tolling orders, see N.Y.C. Transit Auth. v. Am. Transit Ins. Co., 181 N.Y.S.3d 218, 218 (N.Y. App. Div. 2022); and from November

4 to December 31, 2020, by agreement of the parties, see Memorandum of Law, Docket No. 12-11, p. 19.[5]  Adding that 287-day period to the statute of limitations, Nolan's complaint is timely for any claims accruing on or after August 1, 2019.

But Nolan's claims are also subject to the statutory notice-of-claim requirement. Nolan alleges that he served Defendant WROTB with a Notice of Claim on September 21, 2020, and that more than 30 days elapsed without payment of the claim.[6]  Complaint, ¶¶ 7-8 and Exhibit A; N.Y. Rac., Pari-Mut. Wag. & Breed. L. § 514 (1).  Service of the Notice of Claim occurred during the toll period spurred by the COVID-19 pandemic. Consequently, Nolan's Notice of Claim is timely for claims accruing on or after December 21, 2019 (90 days before the start of the tolling period on March 20, 2020).

Defendants first argue that Nolan's retaliation claim under § 75-b (2)(a) of the New York Civil Service Law and intentional-infliction-of-emotional-distress claim, which are both based on the same underlying conduct, must be dismissed because they did not accrue on or after December 21, 2019.  In this regard, Defendants focus on the dates Nolan discussed WROTB's alleged wrongdoing with various individuals and entities: February and March 2019 with the WROTB Board of Directors; sometime thereafter with WROTB's counsel; sometime between March and October 2019 with law enforcement investigators; and sometime further thereafter with WROTB's outside counsel.  See Complaint, ¶¶ 23, 24, 25, 27, 36, 40, 55.  Each of these interactions pre-dates December 21, 2019.

---

[5] Nolan does not contest Defendants' representation that a tolling agreement was in place.

[6] Nolan's termination is not included in this Notice of Claim, but rather, was raised in a second Notice of Claim.  The second Notice of Claim is not part of Nolan's complaint in this action.

Nolan's claims, however, are centered around the "continuing campaign" of retaliation he allegedly endured as a result of these interactions.  Id. ¶ 79.  Although the complaint does not pinpoint the exact date the retaliation began, Nolan alleges that Defendant Bianchi ceased all communication with him "[b]eginning in April 2019, and continuing through the date on which [Nolan] was terminated from his employment by WROTB," which was December 18, 2020.  Id. ¶¶ 16, 60 (b).  Nolan also alleges that he was excluded from Board meetings, Executive Session meetings, closed door meetings, and other management events "on various dates between June 2019 and the date on which Plaintiff was terminated from his employment."  Id. ¶¶ 16, 60 (a).  And as to all of the retaliatory conduct, Nolan alleges that it occurred "on a continuing and ongoing basis from the time Plaintiff first informed Defendants of his contacts with the FBI and collaborating investigating agencies, through September 3, 2020 when Plaintiff's treating physician placed Plaintiff on medical leave for anxiety and depression caused by Defendants' actions, and continuing to at least December 18, 2020, the day Defendants wrongfully terminated [Nolan]."  Id. ¶¶ 83, 84.

Reading the complaint liberally, as required, see ATSI Commc'ns, 493 F.3d at 98, this Court finds that Nolan alleges at least some retaliatory conduct occurring after December 21, 2019.  In particular, he alleges that the retaliatory conduct alleged in the complaint continued and persisted through December 18, 2020, the date his employment was terminated.  See Complaint, ¶¶ 60 (a), 60 (b), 83.  Discovery is necessary to flesh out the exact acts and dates.  Defendants' motion to dismiss Nolan's second and third causes of action on timeliness grounds will therefore be denied.

Nolan also argues that all of his allegations and claims are timely under the continuing-violation doctrine.  That doctrine provides that "[d]espite the general principle that a cause of action accrues when the wrong is done, regardless of when it is discovered, certain wrongs are considered to be continuous wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act."  Neufeld v. Neufeld, 910 F. Supp. 977, 982 (S.D.N.Y. 1996) (quoting Leonhard v. United States, 633 F.2d 599, 613 (2d Cir. 1980)); Selkirk v. State of N.Y., 671 N.Y.S.2d 824 (N.Y. App. Div. 1998) (stating that the continuing-violation doctrine "is usually employed where there is a series of continuing wrongs and serves to toll the running of a period of limitations to the date of the commission of the last wrongful act").  Importantly, however, the doctrine "may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct."  Selkirk, 671 N.Y.S.2d at 824.

Citing federal cases analyzing federal law, Defendants maintain that the continuing-violation doctrine does not apply to Nolan's state retaliation claims.  While this Court noted those federal cases in its previous decision discussing Nolan's First Amendment claim,[7] see Nolan, 2022 WL 7085517, at *7, New York courts have applied the doctrine to state retaliation claims, see, e.g., Ferraro v. N.Y.C. Dep't of Educ., 982 N.Y.S.2d 746, 746 (N.Y. App. Div. 2014); Donas v. City of New York, 878 N.Y.S.2d 360, 361 (N.Y. App. Div. 2009); Clark v. State of N.Y., 754 N.Y.S.2d 814, 817 (N.Y. App. Div. 2003); Schussler v. Dep't of Ed. of City of New York, 212 N.Y.S.3d 915, at *7 (Sup. Ct. 2024) (unpublished).

---

[7] Defendants contend that this Court previously determined that the continuing-violation doctrine does not apply to retaliation claims.  This Court's discussion of the doctrine, however, was limited to federal law.  See Nolan, 2022 WL 7085517, at *7, *11.  This Court did not reach Nolan's state-law claims.  See id. at *12-13.

Given that Nolan plausibly alleges retaliatory conduct within the statute of limitations period, this Court finds it most prudent to defer decision on whether the continuing-violation doctrine applies to bring in arguably untimely retaliatory conduct until the summary-judgment stage, when this Court will have the benefit of additional briefing and a fully developed factual record. Cf. Monsour v. N.Y.S. Off. for People with Developmental Disabilities, No. 1:13-CV-336 (TJM)(CFH), 2014 WL 975604, at *6 (N.D.N.Y. Mar. 12, 2014) (analyzing the continuing-violation doctrine in the context of a federal § 1983 claim and concluding that "[w]hether Plaintiff has been subject to a pattern of connected retaliatory treatment as he alleges in his lengthy Amended Complaint, or to discrete unrelated events, is an issue that cannot be resolved at the Rule 12 stage").

Defendants next argue that Nolan's claim for reimbursement or indemnification of attorneys' fees under the New York Public Officers Law must be dismissed as untimely. The New York Public Officers Law provides for reimbursement or indemnification of certain legal fees. As a claim brought against Defendant WROTB, the 1 year and 90 days statute of limitations set forth in § 514 (5) of the N.Y. Rac., Pari-Mut. Wag. & Breed. L. applies.

Nolan alleges that he personally retained counsel "in and around" the same time he met with law enforcement investigators, which it appears was between March and October 2019. See Complaint, ¶¶ 40-42. He further alleges that he incurred attorneys' fees and submitted his legal bills to Defendant WROTB for payment. Id. ¶¶ 24, 36, 43, 90, 91. But there are no allegations that Nolan incurred any legal fees on or after December 21, 2019. Instead, Nolan's allegations encompass the time between March and October 2019. Id. ¶¶ 40-42. Nolan thus fails to allege any timely claims under the

New York Public Officers Law.  Moreover, Nolan offers no response to Defendants' statute of limitations argument and therefore abandons his claim.  See Malik v. City of New York, 841 F. App'x 281, 284 (2d Cir. Jan. 11, 2021) ("But when a party fails adequately to present arguments in a brief, a court may properly consider those arguments abandoned, especially in the case of a counseled party where a court may infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.") (quotation marks and citations omitted); Guadagna v. Zucker, CV 17-3397 (SJF)(AKT), 2021 WL 11645538, at *21 (E.D.N.Y. Mar. 19, 2021); Williams v. Suffolk Cnty., 284 F. Supp. 3d 275, 284 (E.D.N.Y. 2018) (collecting cases). Nolan's fourth cause of action will therefore be dismissed as barred by the statute of limitations.

### b.  New York Civil Service Law Claim

Section 75-b of the New York Civil Service Law governs retaliatory actions taken by public employers.  As relevant here, the statute provides as follows:

> A public employer shall not dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action.

N.Y. Civ. Serv. L. § 75-b (2)(a).  An "improper governmental action" is "any action by a public employer or employee, or an agent of such employer or employee, which is undertaken in the performance of such agent's official duties, whether or not such action is within the scope of his employment, and which is in violation of any federal, state or

local law, rule or regulation."  Id.  An adverse personnel action must affect "compensation, appointment, promotion, transfer, assignment, reassignment, reinstatement or evaluation of performance."  N.Y. Civ. Serv. L. § 75-b (1)(d).

To state a retaliation claim under § 75-b, "a plaintiff must allege (1) an adverse personnel action; (2) disclosure of [qualifying] information to a governmental body, and (3) a causal connection between the disclosure and the adverse personnel action." Krzesaj v. N.Y.C. Dep't of Educ., No. 16 CIV. 2926 (ER), 2017 WL 1031278, at *11 (S.D.N.Y. Mar. 15, 2017); Burns v. Cook, 458 F. Supp. 2d 29, 44 (N.D.N.Y. 2006).

Here, Nolan alleges multiple adverse employment actions affecting his compensation, appointment, assignments, and evaluations of performance.   See Complaint, ¶¶ 59-63.  He further alleges that he disclosed to government investigators various improprieties by Defendant WROTB that he reasonably believed to be true and reasonably believed to constitute improper governmental action.  Id. ¶¶ 28, 36, 39, 40, 44-48, 75.   Finally, he alleges that Defendant WROTB took the various adverse employment actions against him because he disclosed its improprieties to investigators. Id. ¶¶ 59, 63, 79.

Defendants first argue that this claim should be dismissed because Nolan fails to identify any federal, state, local law, rule, or regulation that WROTB violated by providing health insurance to Board members.  But such detail is not required at the pleading stage. It is enough that Nolan alleges his belief that the various improprieties he reported, which the complaint does not limit to the provision of health insurance, constituted improper governmental action.  See N.Y. Civ. Serv. L. § 75-b (2)(a).  In any event, Nolan also

specifically alleges that two lawyers or law firms separately opined that the provision of health insurance was improper or illegal.  See Complaint, ¶¶ 28, 32.

Defendants next argue that Nolan's claim should be dismissed because providing free health insurance to its Board members does not violate any laws, rules, or regulations.  This contention is directly contrary to the allegations in the complaint, see Complaint, ¶¶ 28, 32, and requires a factual inquiry, which is not proper at this stage. Accordingly, this argument is rejected.

Finally, Defendants argue that the time between Nolan's disclosures to investigators and his termination is too long to support a causal connection.  But Nolan's termination is not the only retaliatory act he alleges.  As discussed, the complaint contains a litany of allegedly adverse employment actions that occurred on an ongoing basis in response to Nolan's reports of Defendant WROTB's improprieties.  See Complaint, ¶¶ 59-63, 83.  The complaint thus sufficiently alleges the required causal connection for purposes of surviving Defendants' motion to dismiss.

For these reasons, Defendants' motion to dismiss Nolan's state retaliation claim is denied.

### c.  Intentional-Infliction-of-Emotional-Distress Claim

To state a claim for intentional infliction of emotional distress in New York, a plaintiff must allege "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress."  Howell v. N.Y. Post Co., 81 N.Y.2d 115, 121 (1993).  Liability can be found only where the conduct alleged is "so outrageous in character, and so extreme in degree, as to go beyond all possible

bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  Howell, 81 N.Y.2d at 122; see also Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293 (1983).  "Whether or not the requisite outrageousness of the conduct has been satisfied by the allegations is, in the first instance, an issue of law for judicial determination."  164 Mulberry St. Corp. v. Columbia Univ., 771 N.Y.S.2d 16 (N.Y. App. Div. 2004); see also Lewis Fam. Grp. Fund LP v. JS Barkats PLLC, 16-CV-5255 (AJN)(JLC), 2021 WL 1203383, at *12 (S.D.N.Y. Mar. 31, 2021) ("Given the 'rigorous' requirements, courts often dismiss intentional infliction of emotional distress claims under the 'extreme and outrageous conduct' prong as a matter of law.").

Defendants Bianchi and Wojtaszek maintain that this claim must be dismissed because Nolan fails to plead conduct rising to the level of "extreme and outrageous."  This Court agrees.  Even assuming the truth of Nolan's allegations, the acts of which he complains—shunning, subordination, false performance ratings, pressure to resign, termination—were all taken in the employment context and do not rise to the level of atrociousness necessary to support an intentional-infliction-of-emotional-distress claim. See Drimer v. Zionist Org. of Am., 150 N.Y.S.3d 48, 50 (N.Y. App. Div. 2021) (dismissing intentional-infliction-of-emotional-distress claim based on workplace misconduct for lack of outrageousness); Bradley v. Consol. Edison Co. of N.Y., Inc., 657 F. Supp. 197, 205 (S.D.N.Y.1987) (finding that conduct "must consist of more than mere insults, indignities and annoyances and must be so shocking and outrageous as to exceed all reasonable bounds of decency"); see also Chau v. Donovan, 357 F. Supp. 3d 276, 287 (S.D.N.Y. 2019) ("In the rare instances where New York courts have recognized a claim for

[intentional infliction of emotional distress] in the employment context, the claims have alleged not merely sexual harassment, but more significantly, battery.").

Moreover, in New York, "a person may not bring claims for intentional infliction of emotional distress or negligent infliction of emotional distress where, as here, there are more traditional theories of tort liability available." Hays v. City of New York, 14-CV-10126 (JMF), 2017 WL 782496, at *5 (S.D.N.Y. Feb. 28, 2017) (citing cases).  That is, "New York does not recognize [intentional-infliction-of-emotional-distress] or [negligent-infliction-of-emotional-distress] causes of action where the conduct underlying them may be addressed through traditional tort remedies . . . ." Berrio v. City of New York, 15-CV-09570 (ALC), 2017 WL 118024, at *7 (S.D.N.Y. Jan. 10, 2017); see also Salmon v. Blesser, 802 F.3d 249, 257 (2d Cir. 2015) (noting that "[a]ll four Appellate Division courts [in New York] have answered the question" of "whether an intentional infliction claim can ever be brought where the challenged conduct falls well within the ambit of other traditional tort liability" and have "held it cannot").  Thus, emotional distress claims may "be invoked only as a last resort." Turley v. ISG Lackawanna, Inc., 774 F.3d 140, 158-160 (2d Cir. 2014).

Here, Nolan's intentional-infliction-of-emotional-distress claim involves the same conduct that underlies his federal and state retaliation claims.  Because alternate remedies are available, Nolan's emotional distress claims must be dismissed for this reason as well.  See Powell v. City of Jamestown, Case No. 1:21-cv-721, 2022 WL 1913581, at *21 (W.D.N.Y. June 3, 2022) (dismissing intentional-infliction-of-emotional-distress claim where the complained of conduct was already the subject of other claims); Jones v. Parmley, 5: 98-CV-374 (FJS/TWD), 2016 WL 5793711, at *1 (N.D.N.Y. Oct. 4,

2016) (collecting cases standing for the proposition that emotional distress claims do not survive when other remedies remain available).

### d.  New York Labor Law Claim

Defendants seek dismissal of Nolan's New York Labor Law § 740 claim on the basis that the statute does not apply to Nolan because he is a public employee governed by § 75-b of the New York Civil Service Law.  Nolan agrees and concedes that this claim should be dismissed.  See Memorandum of Law, Docket No. 16, p. 26.  This claim is therefore dismissed by agreement.

## C.  Leave to Amend

Nolan does not request leave to amend his complaint in either his original motion papers or his supplemental briefing.  Defendants will therefore be directed to answer the complaint without amendment.  See Gallop v. Cheney, 642 F.3d 364, 369 (2d Cir. 2011) (holding that a district court does not abuse its discretion by denying leave to replead in the absence of such a request).

## IV.   CONCLUSION

For the reasons stated above, this Court finds that Defendants' motion to dismiss must be granted in part and denied in part.  Nolan's First Amendment claim against Defendants Bianchi and Wojtaszek in their official capacities and his New York Labor Law claim are dismissed by agreement.  Nolan's New York Public Officers Law claim and his intentional-infliction-of-emotional-distress claim are dismissed for the reasons set forth above.  All other claims remain.  Defendants will be directed to answer the complaint as set forth below.

## V.     ORDERS

IT HEREBY IS ORDERED, that Defendants' motion to dismiss (Docket No. 12) is GRANTED in part and DENIED in part, consistent with the foregoing decision.

FURTHER, that Plaintiff's First Amendment claim against Defendants Bianchi and Wojtaszek in their official capacities and his New York Labor Law claim are DISMISSED by agreement.

FURTHER, that Plaintiff's New York Public Officers Law claim and his intentional-infliction-of-emotional-distress claim are DISMISSED for the reasons set forth herein.

FURTHER, that Defendants must answer the complaint within 14 days of the entry date of this decision.

SO ORDERED.


Dated:        October 23, 2024
              Buffalo, New York


                                        s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge